AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

In the Matter of the Search of
the e-mail account and information
associated with the e-mail account
adam_shorr@yahoo.com that is stored at
premises owned, maintained, controlled, or
operated by Oath Holdings, Inc., more fully
described in Attachment A, attached hereto.

)
)
)
)
)
)
)

Case No.   22-sw-00016-KLM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the_____State and_____District of_____California and elsewhere_____, there is now concealed *(identify the person or describe the  property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 | Health care fraud; |
| 18 U.S.C. § 1349 | Conspiracy to commit health care fraud; |
| 42 U.S.C. § 1320a-7b(b) | Soliciting/receiving or offering/paying illegal kickbacks and bribes; |
| 18 U.S.C. § 371 | Conspiracy to commit an offense against the United States; |
| 18 U.S.C. § 220 | Eliminating Kickbacks in Recovery Act. |

The application is based on these facts:
- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of_____days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____s/Cory Rumple_____
*Applicant's signature*

Special Agent Cory Rumple, U.S. Department of Health and Human Services, Office of Inspector General
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   **10 Jan 2022**

_____
*Judge's signature*

Kristen L. Mix
United States Magistrate Judge
*Printed name and title*

City and state:   Denver, CO

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

Information associated with the e-mail account known as adam_shorr@yahoo.com (hereinafter and in Attachment B "SUBJECT ACCOUNT"), which is in the possession of or under the control of the E-mail and Internet Service Provider Oath Holdings Inc., whose office is located at 701 First Avenue, Sunnyvale, California, 94089 (hereinafter and in Attachment B "PROVIDER.")

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

Pursuant to 18 U.S.C. § 2703, PROVIDER, as described in Attachment A, is hereby ordered as follows:

## I.  SEARCH PROCEDURE

a.  The search warrant will be presented to personnel of the PROVIDER, who will be directed to isolate those accounts and files described in Section II, below, regardless of whether such information is stored, held or maintained inside or outside of the United States;

b.  To minimize any disruption of computer service to innocent third parties, the PROVIDER'S employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

c.  The PROVIDER'S employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

d.  Law enforcement personnel will thereafter review all information and records received from the PROVIDER'S employees to determine the information to be seized by law enforcement personnel specified in Section III.

## II.  FILES AND ACCOUNTS TO BE DISCLOSED BY THE PROVIDER'S EMPLOYEES

a.  For the SUBJECT ACCOUNT listed in Attachment A, for the time period from the date the SUBJECT ACCOUNT was created, to the date the PROVIDER collects the data in response to this order, the PROVIDER shall disclose the following information regardless of whether it is held inside or outside the United States, and the disclosure shall include all information even if deleted yet still available to the PROVIDER, and all information preserved pursuant to requests under 18 U.S.C. § 2703(f), **Oath Holdings Inc., reference numbers 498596 and 505021.**

1.  The contents of all e-mails and attachments associated with the SUBJECT ACCOUNT, including deleted, stored, or preserved (pursuant to 18 U.S.C. § 2703(f) or otherwise) e-mails sent to and from the account, draft e-mails, existing printouts of any such e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

1

2.  The services the SUBJECT ACCOUNT utilized and all records generated by those Services, and all records or other information stored at any time by an individual using the SUBJECT ACCOUNT, including information from or associated with address books, contact and buddy lists, calendar data, pictures, and files. This includes the contents of all data associated with the SUBJECT ACCOUNT for services provided by PROVIDER, including Messenger, Yahoo Address Book, Yahoo Calendar, Yahoo Notepad, Yahoo Answers, or any other Yahoo services.

3. All data collected or identified by cookies or other methodology, including LINKED ACCOUNTS, internet searches or internet history, bookmarks, and other data collected and held by PROVIDER from or regarding the SUBJECT ACCOUNT, the user of the SUBJECT ACCOUNT, and devices used to access the SUBJECT ACCOUNT.

4.  All records and information regarding locations where the SUBJECT ACCOUNT was accessed or used, including all data stored in connection with Location Services.

5.  All records pertaining to communications between the PROVIDER and any person regarding the account, including contacts with support services and records of actions taken.

6.  All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to the provider (including, but not limited to, the keybag.txt and fileinfolist.txt files).

7.  All records or other information regarding the identification of the SUBJECT ACCOUNT, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses, phone numbers, or other identifying information provided during registration, other associated e-mail and other online accounts, all screen names associated with the subscribers and/or accounts, methods of connecting, log files, and means and source of payment (including any credit or bank account number).

8.  For all information responsive to this warrant, regardless of whether such information is stored, held, or maintained inside or outside of the United States, the physical location or locations where the information is stored.

b.  The Provider is hereby ordered to disclose the above information to the United States within **fourteen days** of the issuance of this warrant.

## III.  INFORMATION TO BE SEIZED BY LAW ENFORCEMENT PERSONNEL

All information described above in Section II that constitutes evidence and instrumentalities of violations of 18 U.S.C. §§ 1347, 1349, 371, & 200, and 42 U.S.C. § 1320a-7b(b), pertaining to genetic testing (the "SUBJECT OFFENSES"), those offenses occurring in or after January 2020 and continuing through the date the Provider collects the data described in Section II, including for each account or identifier listed on Attachment A, information pertaining to the following matters:

1.  All electronic mail, attachments, related computer files, and any data or information that identify the account user, individuals, or correspondents engaged in the SUBJECT OFFENSES.

2.  All "address books" or other lists of correspondents or other lists of correspondents relevant to the SUBJECT OFFENSES.

3.  Information regarding, related to, evidencing, or including:

    a.  Genetic testing, including any type of such testing or testing targeting or linked to any disease or medical condition;

    b.  Call centers used to contact individuals regarding genetic testing or other medical services;

    c.  Companies that sell data used to identify potential contacts for genetic testing and individuals associated therewith; data provided by such companies; and the methodology used to collect such data;

    d.  The user's and/or co-conspirators' knowledge regarding marketing methods used to solicit individuals for laboratory testing or other medical services, including how data/marketing companies work, what information is sold and how it is obtained, "lead generation" and any "opt-in" or "live transfer" process.

    e.  Online portals or platforms used to store or transmit data pertaining to genetic testing, including identification of the platform, accounts, and login credentials.

    f.  Claro Point, LLC, Claro Scientific Laboratories, LLC, Claro Scientific Laboratories, Inc., Claro Scientific Laboratories, Corp., Claro Labs, Tesis Labs Colorado, Tesis Labs, LLC, Tesis Holding Company, LLC, Alliance DX, LLC, all related entities using similar names (Claro, Tesis, Alliance, and derivations thereof) (hereinafter, the foregoing are all identified as the "Tesis entities"), and any other business entities related to or used in connection with genetic testing, including but not limited to any information for those entities regarding: business processes; operating structure; identification of officers, employees, contractors,

3

or anyone acting with, for, or on behalf of the entity; accounting records; banking information; contracts entered into by the entity, its principals, officers, employees, or others acting for or on behalf of the entity; contract negotiations; office locations; entity business records including identification of the location thereof; identification of electronic devices used by individuals or entities with, by, for, or on behalf of the entity, including their location; invoices and payment; and compliance;

g.  Individuals or entities employed by or acting with, for, on behalf of the Tesis entities, Adam Shorr, Ronald King, Victor Roiter, Tina Wellman, Todd Stottlemyre, Paula Valverde, Bradley Edson, and BrightDrive HCS, including all communications involving or pertaining to the foregoing;

h.  All contracts and agreements, in any form, and between any entities, pertaining to genetic testing;

i.  Requisition forms for laboratory genetic tests, letters of medical necessity for genetic tests, and any other communications or information pertaining to or purporting to establish coverage and/or medical necessity for genetic testing;

j.  Medical professionals, including doctors, nurses, and physician's assistants; telehealth, telemed, or any type of company that provides or contracts for the services of medical professionals; agreements with the foregoing; and payment for the services of medical professionals or to the organizations or companies providing medical professionals;

k.  Payments to any individual or entity participating in the genetic testing business, including marketers, physicians or other medical providers, telehealth companies, call centers, laboratories, employees and contractors of the Tesis entities, and all business entities owned or controlled by such individuals and entities, as well as any payment processing entities or other businesses used to make or facilitate such payments;

l.  Bank accounts used to make and receive payments related to the SUBJECT OFFENSES, to hold funds that may have been obtained from the SUBJECT OFFENSES, to be used in furtherance of the SUBJECT OFFENSES, or to which individuals acting with or on behalf of the Tesis entities, had access;

m.  Individuals who received, were to receive, provided samples for the purpose of receiving, or discussed or were discussed as the subject of, genetic testing, including all identification information, including name, date of birth, address, e-mail address, phone number, contact information, medical identification numbers, social security numbers, insurance type, insurance identification number, payment information, or any other means of identifying the individual;

n.  Medicare (including both Medicare Part B and Medicare Advantage (Part C) plans, herein, collectively, "Medicare") or Medicaid, including payment or coverage rules, payments from Medicare or Medicaid, claims submitted or contemplated to be submitted to Medicare or Medicaid, and explanations of benefits or statements of services provided or covered;

o.  Private insurance companies, including payment or coverage rules, payments from such companies, claims to such companies, and explanations of benefits or statements of services provided or covered;

p.  Samples for genetic cancer testing, including buccal swabs, and methods used to obtain samples, including offering of incentives or remuneration of any kind;

q.  Locations where samples for genetic testing were obtained and any contracts or agreements entered into for that purpose;

r.  Marketing companies, telemarketing companies, and any individual or entity involved in identifying and contacting beneficiaries for testing, soliciting beneficiaries for testing, and facilitating testing;

s.  Laboratories (including reference laboratories and laboratories owned or operated by Tesis entities) performing or associated with the completion of genetic testing, including the certifications for such laboratories, personnel associated with such laboratories, and all processes and procedures associated with such laboratories;

t.  Individual and entity investors in any company or other entity that loaned, provided a line credit, or transferred money in any capacity to the Tesis entities;

u.  The Antikickback Statue ("AKS") and the Eliminating Kickbacks in Recovery Act ("EKRA"); and

v.  Relationships between the participants in the SUBJECT OFFENSES, including length and history of relationship (business or personal), the participants' knowledge of each others' background, knowledge, and abilities; and substance and status of relationships.

4.  Records relating to who created, used, or communicated with the SUBJECT ACCOUNT regarding the SUBJECT OFFENSES, including records about their identities and whereabouts.

5.  Information about the devices used to access the SUBJECT ACCOUNT that is evidence of or identifies persons involved in the SUBJECT OFFENSES.

6.  Information about any and all linked accounts or data (including information provided by or collected through cookies), such as related accounts, internet searches,

5

bookmarks, or other such information that is evidence of or assists in identification of persons involved in the SUBJECT OFFENSES or consists of evidence of related to the SUBJECT OFFENSES, including state of mind, knowledge of legal requirements pertaining to the genetic testing industry and the SUBJECT OFFENSES.

7. Images, correspondence, and other records that help identify the user of the SUBJECT ACCOUNT.

8. Evidence indicating how and when the SUBJECT ACCOUNT was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the Alleged Violations and the account subscriber.

9. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information).

10. Evidence indicating the subscriber's or co-conspirators' states of mind as related to the crimes under investigation, including evidence of financial status or motives to commit the SUBJECT OFFENSES.

11. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

12. Content of web history and searches related to the SUBJECT OFFENSES, including searches regarding laws covering health care, Medicare/Medicaid, and laboratory testing; genetic testing; Medicare; Medicaid, including Colorado Medicaid rules and regulations; laws and regulations regarding payment of kickbacks; laboratories; telemed, telehealth, or other similar companies; news articles involving genetic testing; and information regarding facilities that assist or provide services to low income individuals, including homeless shelters and food banks; nursing homes; and assisted living facilities.

13. Location information associated with the SUBJECT ACCOUNT that helps identify the user of the account or events relating to the SUBJECT OFFENSES to determine the chronological and geographic context of account access, use, and events relating to the SUBJECT OFFENSES and to the SUBJECT ACCOUNT owner and the owner's contacts that are evidence of the SUBJECT OFFENSES.

As used herein, "information" means any record, document, recording, data, or item in whatever form and by whatever means created or stored.

## IV.  ORDER OF NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE

a.  Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders PROVIDER not to disclose the existence of this search warrant to any person for a period of one year, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

b.  The Court further orders PROVIDER to continue to maintain the SUBJECT ACCOUNT in an open and active status so as not to disrupt this ongoing investigation.

## V.  PROVIDER PROCEDURES

a.  The PROVIDER shall deliver the information set forth above within **fourteen days** of the service of this warrant and the PROVIDER shall send the information via facsimile or United States mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium, to:

Special Agent Cory Rumple
U.S. Department of Health and Human Services
Office of Inspector General
1961 Stout Street, 9th Floor
Denver, CO 80294
Cory.Rumple@oig.hhs.gov

b.  Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.

# AFFIDAVIT

I, Cory Rumple, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKRONUND

1.      I am a Special Agent with the Department of Health and Human Services, Office of Inspector General (HHS-OIG) and have been since May 2015. Prior to that, I was a Special Agent with the U.S. Environmental Protection Agency, Office of Inspector General (EPA-OIG). I was a Special Agent with (EPA-OIG) for approximately ten years. I have conducted investigations involving health care fraud, public corruption, grant and contract fraud, and wire and mail fraud. I have also completed numerous fraud investigation trainings. I have a Bachelor of Science in Criminal Justice and a Master of Arts in Legal Studies. I am also a member of the Guardians Task Force through the U.S. Department of Justice, created to investigate violations of criminal statutes involving tribal nations. As a Special Agent with HHS-OIG, I investigate criminal violations of, inter alia, 18 U.S.C. §§ 1347 and 1349 and 42 U.S.C. § 1320a-7b. As part of my training and experience, I have participated in investigations involving electronic evidence, e-mails, text messages, and the Internet.

2.      This affidavit is made pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), in support of an application for a warrant to search the e-mail account described in Attachment A ("SUBJECT ACCOUNT") and all content found therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence and instrumentalities of violations of 18 U.S.C. § 1347 (health care fraud), 18 U.S.C. § 1349 (conspiracy to commit a Title 18 offense, namely health care fraud), 42 U.S.C. § 1320a-7b(b) (soliciting/receiving or offering/paying an illegal kickbacks and bribes in exchange for a health care referral for services paid for by Federal health care program (e.g., Medicare and Medicaid)), 18 U.S.C. § 371 (conspiracy to commit an offense against the United States, specifically soliciting/receiving and offering/paying illegal kickbacks and bribes), and 18 U.S.C. § 220 (the Eliminating Kickbacks in Recovery Act, prohibiting payment for referrals to laboratories for services paid for by a health care benefit program, which includes private insurance) (the "SUBJECT OFFENSES").

3.      Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that evidence and instrumentalities of violations of the SUBJECT OFFENSES are present at the location described.

4.      The information contained within the affidavit is based on my investigation, my training and experience, and information provided to me by other law enforcement officers involved in this investigation.

## SUMMARY OF INFORMATION SOUGHT

5.      The evidence summarized below indicates that Tesis Labs, LLC and its subsidiaries and related entities, including Claro Scientific Laboratories, Corp., Claro Scientific Laboratories, Inc., Claro Point, LLC, Claro Labs, and Tesis Labs Colorado (collectively, the Claro/Colorado entities are referred to as "Claro"), and Alliance DX, LLC and its related entities (collectively, Alliance), and employees and contractors of the foregoing (hereinafter, the Claro, Alliance, and Tesis entities are collectively referred to as "Tesis") are involved in a fraudulent genetic testing scheme that also involves the payment of illegal kickbacks for health care referrals.

6.      In general, the scheme involves recruitment of Medicare and Medicaid beneficiaries and private insurance patients (collectively, hereinafter, the "beneficiaries"), to receive genetic tests run on buccal (cheek) swabs collected from the beneficiaries. Tesis pays marketing companies to recruit beneficiaries to agree to submit to genetic testing and provide a buccal swab for that purpose, then to refer those beneficiaries specifically to Tesis for completion of the testing. The marketing companies, with Tesis's knowledge, also solicit and pay medical providers to purport to authorize the "medical necessity" of the test by signing a medical requisition form that is submitted with the genetic sample to the lab. In fact, there is probable cause to believe the tests are in violation of coverage rules and, therefore, any claims for such tests are fraudulently submitted. Upon receipt of the genetic sample and the requisition form, Tesis either completes the test itself in laboratories it owns, or it submits the tests to reference labs (a third party lab that completes the test on behalf of Tesis) to run the tests. Tesis then bills Medicare, Medicaid, and private insurance companies for genetic tests performed on the swabs from the referred beneficiaries.  Once Tesis is paid by Medicare and Medicaid or the private insurance companies, Tesis pays a portion of that reimbursement to the marketing companies as a kickback for the referrals.

7.      Adam Shorr ("Shorr") directs and participates in these activities as a representative of Tesis. In so doing, the evidence summarized below indicates that he uses his e-mail address, **adam_shorr@yahoo.com**, the SUBJECT ACCOUNT, as identified herein.

## JURISDICTION

8.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

2

## BACKGROUND CONCERNING E-MAIL

9.      As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail").

10.     An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet—for example, through a university, an employer, or a commercial service—which is called an "Internet Service Provider" or "ISP" (see definition of "Internet Service Provider" below). Once the individual has accessed the Internet, that individual can use an e-mail account provided by their ISP or they can use the Internet to connect to public web-based e-mail services to send and receive e-mail. Web-based e-mail services provide e-mail accounts that may be accessed from any computer that has access to the Internet. In addition, the individual can access websites using web browsers to view or download content or make purchases. The Internet may also be used to access online groups such as chat rooms, websites, social media, newsgroups and video conferencing.

11.     In my training and experience, I have learned that Oath Holdings Inc. (formerly known as Yahoo!) (hereinafter "Provider") provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public. Subscribers obtain an account by registering with Provider. During the registration process, Provider asks subscribers to provide basic personal information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

12.     In general, an e-mail that is sent to a Provider subscriber is stored in the subscriber's "mail box" on Provider servers until the subscriber deletes the e-mail, or until a preservation letter is sent to the e-mail provider. If the subscriber does not delete the message, or if the e-mail provider preserves the content of the account pursuant to a preservation letter, the message can remain on Provider servers indefinitely.

13. In addition to e-mail, Oath Holdings Inc. retains other stored content, which the company identifies as, "[d]ata that our users create, communicate, and store on or through our services. This could include words in a communication (e.g., Mail or Messenger), files uploaded, Yahoo Address Book entries, Yahoo Calendar event details, thoughts recorded in Yahoo Notepad or comments or posts on Yahoo Answers or any other Yahoo property." Like many providers, Oath Holdings Inc. also stores data regarding other accounts and websites accessed by the user that are linked by cookie. A cookie is a small piece of information that is stored on a computer or device and may contain various identifiers for the purposes of recognizing a user or the user's device as the user interacts with websites. Cookie information transmitted to Oath Holdings Inc. associates collected data with the user's Yahoo Account.

14. In addition to the foregoing data, in my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular log-ins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

15. As explained herein, information stored in connection with an e-mail account, including the types of data identified above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

16. In my training and experience, the information stored in connection with an e-mail account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the e-mail provider can show how and when the account was accessed or used. For example, e-mail providers typically log the Internet Protocol (IP) addresses[1] from which users

---

[1] Every computer or device on the Internet is referenced by a unique Internet Protocol address the same way every telephone has a unique telephone number. An IP address is a series of numbers separated by periods; an example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiates access is

access the e-mail account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the e-mail account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail).  Last, stored electronic data may provide relevant insight into the e-mail account owner's state of mind as it relates to the offense under investigation. For example, information in the e-mail account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

17.    ISPs are commercial organizations that are in business to provide individuals and businesses access to the Internet and Internet-based services. As noted with respect to Provider, ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs allow for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic storage," see 18 U.S.C. § 2510(17), and the provider of such a service is an "electronic communications service." An "electronic communications service," as defined by statute, is "any service which provides to users thereof the ability to send or receive wire or electronic communications. 18 U.S.C. § 2510(15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." 18 U.S.C. § 2711(2).

---

assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISPs employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. On the other hand, some ISPs, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over time and is typically assigned to a specific computer.

## INVESTIGATION AND SUBJECT OF SEARCH WARRANT

## OVERVIEW OF THE FEDERAL PROGRAMS AND RELEVANT LAWS

18.     Based upon my training and experience, my participation in this investigation, and my discussions with other law enforcement officers, I have learned, among other things, the following regarding the Medicare program:

A.  Medicare is a federal health care program providing benefits primarily to persons who are 65 years of age or older or who are disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare provides medical insurance coverage for medical services provided by physicians, medical clinics, laboratories, and other qualified and enrolled health care providers. Coverage is provided through "Part B" and Medicare Advantage plans, often referred to as "Part C" (together, hereinafter, "Medicare"), as identified below.

B.  "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries. To be eligible to bill Medicare, a provider must submit an enrollment application to Medicare. The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare. Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare. As a condition of payment, Medicare requires providers to certify that all information on the claim is true, correct, and complete. Additionally, the provider must certify that the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care and that the service was medically necessary for the health and/or wellbeing of the patient.

C.  Under Medicare regulations, a medical provider is permitted to submit claims only for services actually rendered and is required to maintain patient records verifying the provision of services.

D.  To receive reimbursement for a covered service from Medicare, a provider is required to submit a claim, either electronically or in writing. The claim must include information identifying the medical provider submitting the claim, the medical provider rendering the service, the referring physician, the patient, and the services rendered.

E.  One component of Medicare, referred to as "Part B," covers the costs of services including laboratory testing. Medicare covers these costs only if, among other

6

requirements, the relevant services are reasonable, medically necessary, and ordered by a physician.

F.   The Medicare Part B program excludes from coverage diagnostic tests, which include genetic tests, "that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. 411.15S(k)(l). To be considered "reasonable and necessary," Medicare rules require that testing, including genetic testing "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a).

G.   The Medicare Advantage Program provides another way for Medicare-eligible individuals to get health coverage. Medicare Advantage Plans, sometimes called "Part C" or "MA Plans," are offered by Medicare-approved private companies that must follow rules set by Medicare. Private health insurance companies offering Medicare Advantage plans must provide beneficiaries with the same services and supplies offered under Medicare Parts A and B. Companies like Humana, Inc., Aetna, Inc., United Health Group, Inc., and other private companies, along with their related subsidiaries and affiliates, contract with the Centers for Medicare & Medicaid Services ("CMS") to provide care to Medicare Advantage beneficiaries through various plans. The private companies providing Medicare Advantage plans are paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received.

H.   Medicare is a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), and is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

19.   Based upon my training and experience, my participation in this investigation, and my discussions with other law enforcement officers, I have learned, among other things, the following regarding Medicaid programs:

A.   Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and people with disabilities. Medicaid is administered by states, according to federal requirements. The program is funded jointly by states and the federal government.

B.   Every state has a Medicaid program, and each program goes by a different name in each state. Health First Colorado is the Colorado Medicaid Program (hereinafter "Colorado Medicaid"). Every Medicaid program is a public health insurance program that is jointly funded by state and federal funds. As such, all Medicaid programs are

"Federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f), and "health care benefit programs," as defined by 18 U.S.C. § 24(b).

C. The Colorado Medicaid rules require that covered services be medically necessary, stating "[m]edical necessity means that a Medical Assistance program good or service is not primarily for the economic benefit of the provider or primarily for the convenience of the client, caretaker, or provider and is provided in accordance with generally accepted professional standards for health care in the United States." 10 Colo. Code Regs. § 2505-10:8.076.8.

D. Laboratory services are a covered benefit only if specific conditions are met, including the following: (1) the services have been authorized by a licensed physician, (2) the services are performed to diagnose conditions and illnesses with specific symptoms, (3) the services are performed to prevent or treat conditions that are benefits under the Colorado Medicaid program, and (4) the services are not routine diagnostic tests performed without apparent relationship to treatment or diagnosis for a specific illness, symptom, complaint or injury. 10 Colo. Code. Regs. § 2505-10:8.660.3.A(1)–(4).

20. Genetic testing utilizes laboratory methods to analyze genes, which are a portion of one's hereditary DNA code that contributes to, among other things, one's phenotypic traits. Genetic tests can be used to identify health risks, such as a patient's risk for certain types diseases, including cancer and cardiovascular diseases, as the result of DNA mutations. One method of conducting genetic testing is to obtain a DNA sample from a patient using a cheek (buccal) swab that is sufficient to obtain a genetic profile. The DNA swab is then submitted to a clinical laboratory for analysis. Following testing, the results should be sent back to the health care provider who ordered the testing and deemed the testing to be medically reasonable and necessary for treatment and diagnosis of the patient.

21. Cancer genomic ("CGx") testing uses DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing is not a method of diagnosing whether an individual presently has cancer. Cardiovascular genetic testing can identify genetic variants associated with cardiovascular disease. Testing for genetic variants associated with cardiovascular disease is not a method of diagnosing whether an individual has or will necessarily develop a cardiovascular disease.

22. Because genetic tests do not diagnose a disease, as noted above, Medicare covers such tests only in limited circumstances, such as when the beneficiary's treating physician deemed testing necessary for treatment and used the results in the management of the beneficiary's condition. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. For purposes of Colorado Medicaid, the test would only be covered if ordered to diagnose, prevent, or treat a condition and would not be covered if the test has no apparent relationship to treatment or diagnosis. Based on

information learned through the investigation to date, there is probable cause to believe that genetic tests at issue in this investigation are not covered under Medicare or Colorado Medicaid because they cannot diagnose diseases, they appear to be ordered primarily for the economic benefit of the patient recruiters and physicians, due to the payment of kickbacks, and there does not appear to be a relationship to treatment for the beneficiary's specific condition. Knowingly submitting and causing the submission of claims in violation of the Medicare or Medicaid coverage rules is health care fraud in violation of 18 U.S.C. § 1347.

23. Separate and apart from fraud based on the ordering of tests that do not comply with the coverage rules of the public programs, the payment of kickbacks, wherein a payment is offered/made and/or solicited/received, at least in part, in return for or to induce a referral, is illegal. For the reasons outlined herein, there is also probable cause that illegal kickbacks were paid in a violation of 42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 220.

A. The Federal Anti-Kickback Statute prohibits (1) the solicitation or receipt of "any remuneration" in return for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program," and (2) the offer or payment of "any remuneration" to induce a person to refer an individual for such purpose. 42 U.S.C. § 1320a-7b(b)(1)–(2).

1. "Federal health care programs" are defined in Title 42, United States Code, Section 1320a-7b(f). As noted, Medicare and all Medicaid programs are Federal health care programs within the meaning of the statute. Based on bank records received to date, Tesis has received payment from Colorado, Montana, and Wisconsin Medicaid programs.

2. The law provides "safe harbors" that permit a provider of medical services to engage third-parties for service contracts and pay for those services under specified, limited circumstances. The safe harbor applicable to personal services contracts provides that remuneration does not include payment to an agent when, inter alia, "The methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs." 42 C.F.R. § 1001.952(d)(iv).

B. The Eliminating Kickbacks in Recovery Act ("EKRA"), 18 U.S.C. § 220, prohibits the offer, payment, solicitation, or receipt of any remuneration to induce a referral of an individual to a laboratory, or in exchange for an individual using the services of that laboratory. EKRA applies to services covered by a health care benefit program, in or affecting interstate or foreign commerce, as defined by 18 U.S.C. § 24(b). This generally includes most private insurance companies.

## BACKGROUND ON TESIS AND RELATED ENTITIES

24.     Tesis has a website at tesisbiosciences.com (visited January 7, 2022). The website identifies its "locations" as including Scottsdale, AZ ("opening December 2021"), Denver, CO, Lafayette, CO (1408 Horizon Avenue, Suite 101, Lafayette, CO 80026), and Houston, TX (1140 Business Center Drive Suite 360, Houston, TX 77043). Tesis Biosciences LLC is a Delaware entity registered October 17, 2019.

25.     Claro Scientific Laboratories, Corp. was an enrolled Medicare provider when Tesis acquired the lab in February 2020. Tesis officials began discussing acquisition of the lab with Tesis's bank in January 2020. According to CMS documents, the Tesis individuals, specifically Ronald King, accepted assignment of the Medicare Part B payment for Claro via agreement signed on or around April 13, 2020, with an effective date of February 5, 2020. According to Medicare application records, Claro Point, LLC and Claro Scientific Laboratories, Corp. use the address of 1408 Horizon Avenue, Suite 101, Lafayette, CO 80026 (the same address listed on the Tesis website). Medicare records identify the Chief Executive Officer as Ronald King and the owner as Victor Roiter. Bank records from the Bank of Oklahoma show another address used by Claro Point, LLC at 3104 East Camelback Road, #2147, Phoenix, AZ 85016. Those same bank records show Claro Point, LLC and Claro Scientific Laboratories, Corp. are subsidiaries of Tesis Labs, LLC and are 100% owned by Tesis Labs, LLC. The CEO for Tesis Labs, LLC is Ronald King, the COO is Tina Wellman or Dana Dittus (both are so identified as COO in Tesis documents), and the Vice President of Business Development is Victor Roiter. Bank records indicate that the following individuals have signatory authority over Tesis accounts, correspond with bank representatives, or are identified as key employees: Ronald King, Bradley Edson, Todd Stottlemyre, Victor Roiter, and Tina Wellman. According to the Delaware Secretary of State, Claro Point, LLC was incorporated in Delaware on January 21, 2020.

26.     Alliance DX, LLC has been an enrolled Medicare provider since December 2017. Based on information learned in this investigation, it is believed Tesis acquired Alliance in or around October 2020. According to Texas Secretary of State Records, Alliance is a Texas entity located in Houston. Bank records from the Bank of Oklahoma reflect that Bradley Edson, Ronald King, and Todd Stottlemyre are signatories on the Alliance bank accounts and that they requested that the Alliance account be put on the "Tesis platform" so the Alliance bank accounts could be accessed with the Tesis accounts.

27.     According to records provided Tesis to the Bank of Oklahoma, Tesis officials claim they have developed "four unique customized precision-based FDA and CMS approved genetic tests (molecular gene mapping panels) that specifically focus on specialty-based diseases." The four tests are identified as testing related to pulmonary, neurology, cardiology, and prenatal. Claro Scientific Laboratories, Corp. bills Medicare and state Medicaid programs through its NPI number of 1609388842. According to Qlarant Integrity Solutions, LLC ("Qlarant"), the Unified Program Integrity Contractor for the

Centers for Medicare and Medicaid Services, Claro Scientific Laboratories, Corp. (under Tesis ownership) was first paid by Medicare on June 12, 2020. The total amount paid to Claro Scientific Laboratories, Corp. by Medicare between June 12, 2020, and December 17, 2021, was $29,277,891.63, primarily for claims submitted with procedure codes associated with genetic testing, including those pertaining to cardiac conditions, diagnoses of hypertension, shortness of breath, family history of cancer and others. Payment was for claims for approximately 6,920 Medicare beneficiaries.

28.     From January 1, 2020 (approximately one month before the Tesis acquisition), through September 9, 2021, Claro Scientific Laboratories Corp. billed Colorado Medicaid $1,924,115.46 and was paid $1,052,374.11. Bank records currently available also reflect that Medicaid programs in the Wisconsin and Montana paid Claro entities.

29.     For claims submitted from November 2, 2020, through December 28, 2021, Qlarant reports that Medicare paid approximately $15 million to Alliance DX, LLC. Based on the data available to Qlarant, it appears that Alliance DX, LLC has also billed Colorado Medicaid after November 2020.

30.     As outlined below, there is probable cause to conclude that Adam Shorr, for and on behalf of Tesis, worked with marketing companies, telehealth providers, laboratories, and others in the fraudulent genetic testing and kickback schemes. Affiant's investigation shows that Shorr advanced the scheme by communicating through the SUBJECT ACCOUNT.

## INVESTIGATION

31.     The U.S. Department of Health and Human Services, Office of Inspector General, has received numerous hotline complaints through its fraud hotline system pertaining to Tesis. The complaints include beneficiaries advising they received a genetic testing kit that they did not request and physicians advising they did not order genetic testing kits for their patients and would not sign forms saying it was medically necessary for their patient.

32.     In December 2020, the Health Care Fraud Criminal Division for the U.S. Department of Justice began analyzing laboratories all over the country that were billing Medicare for genetic testing. In January 2021, billing data was obtained for Claro Scientific Laboratories Corp., which showed a large volume of Medicare billings for genetic tests. Based upon that data and the numerous hotline complaints, the U.S. Department of Health and Human Services, Office of Inspector General, opened a criminal investigation into Claro and related entities.

33.     During the course of Affiant's investigation, Todd Shull provided documents from his company, Sunrise Consulting Group, LLC ("SCG" or "Sunrise"), which worked with Tesis and its employees and representatives, including Shorr, to solicit and send samples

for genetic testing to Tesis labs. These e-mails included contact with Shorr at the SUBJECT ACCOUNT. Those e-mails he produced that include the SUBJECT ACCOUNT appear to begin in or around August 2019 and continued through approximately July 2021, and pertain to his dealings with Shorr regarding use of call centers, genetic testing, and soliciting beneficiaries, in addition to Shorr's relationship with the Tesis entities and employees. In addition to documents he provided, Shull was interviewed on July 13, 2021, August 26, 2021, September 14, 2021 and November 9, 2021, and provided information included herein.

34.    Shull was associated with a telemarketing company that utilized a call center located in Florida to solicit beneficiaries for genetic tests.  Shull stated employees of the call center contacted beneficiaries across the country via telephone, using a "script" to solicit the beneficiaries to agree to participate in genetic testing. These individuals were identified based on marketing data purchased by the call center or "live transfers" sent to the call center.[2] An e-mail dated April 24, 2020, from a company that sells consumer data went to Shorr at the SUBJECT ACCOUNT, with a copy to Shull. According to Shull, the call center employees called beneficiaries and identified themselves as working for a company pertaining to health care, told them that a genetic test was available for them for free through their insurer, and convinced them to provide their insurance number and address to be sent a genetic testing kit. The call center employees did not explain that they in fact worked for a marketing company and were calling based on purchased personal data. When a beneficiary agreed to submit to a genetic test, call center employees, including Shull, shipped out a kit to the beneficiary's home address that included a swab and instructions for the beneficiary on how to obtain a genetic sample from their cheek.  The beneficiary would collect the genetic sample, then send the swab via a prepaid, labeled envelope to one of the Tesis labs for processing. Swabs sent to the Claro lab were shipped to Lafayette, Colorado. Swabs for Alliance were shipped to Texas.

35.    Shull reported that the genetic sample must be sent to the laboratory with a medical requisition form or letter of medical necessity purporting to authorize the necessity for the test. Shull reported that he worked with medical professionals and telehealth companies to obtain sign off on the "medical necessity" for the genetic test in one of two ways. First, at the beginning of the genetic testing relationship between Shull and Tesis, which commenced in or around early 2020, they used telehealth companies. When using telehealth, the patient was contacted regarding submission of a genetic testing sample, but the "medical necessity" came in the form of a requisition form signed off on by a telehealth doctor who had no preexisting relationship with the patient, was not treating the patient, and did not intend to treat the patient going forward. Shull reported that the parties moved away from the telehealth model to a "doctor chase" model in or around July 2020. Under the "doctor chase" model, the call center employees would convince the beneficiaries to identify their primary care physician. The call center would then

---

[2] Shull did not explain in detail how the "live transfer" method worked.

reach out to the medical office of the primary care physician, also using a "script" explaining that their patient was requesting a test that is covered by insurance but just required the physician to sign off on the test, or simply sending a form for approval to the physician's office.[3] Shull ceased working with Tesis in or around July 2021, near the time a search warrant (pertaining to a separate criminal investigation) was executed at the call center he worked with in Florida. Based on a hotline complaint recently received at HHS, it appears that Tesis either has returned to the telehealth model or continued to use the telehealth model through other marketing companies, like SCG, that Tesis worked with. Shull reported that he knew Tesis worked with several other marketing companies, but he was not familiar with what tactics they used.

36.    Shull reported that the laboratories, marketing companies, and telehealth companies used "CRMs," or customer relationship management platforms to track beneficiaries and their tests and to store documents pertaining to the testing. These platforms could be accessed by individuals from different business entities via a login and password entered into an internet portal.

37.    Shull and his company, SCG, contracted with Tesis labs to solicit and refer beneficiaries to the labs for genetic testing. Shull provided, among other documents, the following contracts between Shull and the Tesis labs:

- Marketing Business Services Agreement between SCG and Claro Scientific Laboratories, Inc., for SCG to provide "marketing and business services" to the lab. The contract provided for payment to SCG of $100,000.00 every 30 days. Shull e-mailed signature pages dated March 25, 2020, for this contract, along with a separate copy of the contract, to Shorr at the SUBJECT ACCOUNT on March 25, 2020.
- Marketing Business Services Agreement between SCG and Claro Scientific Laboratories, Inc., (identified as located in Lafayette, Colorado), for SCG to provide "marketing and business" services to the lab. The agreement stated that payment would be made monthly at the rate of "$100,000.00 equally divided into 2 (two) payments (e.g. $ 75,000.00 [sic] to be paid on the 15th and the remaining $75,000 to pe paid on the 30th)." Shull signed the agreement September 29, 2020.
- Marketing Business Services Agreement between SCG and Claro Scientific Laboratories, Inc., as above, but updating the agreement to reflect payment terms to total $150,000 per month "equally divided into 2 (two) payments (e.g. $ 75,000.00

---

[3] A hotline complaint indicates this process was similarly misleading. Another complaint, dated September 25, 2020, was initiated by a physician. The complaint stated the following: "My patient was called multiple times on her home phone soliciting genetic laboratory tests. She refused services and did not give out any of her personal information. This company, Claro Laboratory, somehow obtained her information and information that I am her primary physician and faxed a lab order to my office. I verified with the patient that she did not request any testing and did not give out any personal information including her physician's information."

[sic] to be paid on the 15th and the remaining $75,000 to pe paid on the 30th).” Shull signed the agreement September 30, 2020.

- Marketing Business Services Agreement between SCG and Claro Scientific Laboratories, Inc., for SCG to provide “marketing and business” services to the lab. The agreement provided for Claro to pay SCG $150,000 per month, consistent with the September contract. Shull signed the agreement October 16, 2020.
- Marketing Business Services Agreement between SCG and Claro Scientific, LLC. The contract called for SCG to provide “marketing and business services” to the lab “at an annual rate of $2,400,000,” paid monthly. Shull signed the agreement on July 7, 2021.
- Marketing Business Services Agreement between Sunrise Consulting Group and Alliance DX, LLC. The contract called for SCG to provide “marketing and business services” to the lab “at an annual rate of $1,500,000,” paid monthly. Shull signed the agreement on July 7, 2021.

38.  These contracts were structured to be based on a “flat fee” payment on a monthly basis in exchange for “marketing and business” services. The contract was structured as a flat fee to avoid paying the marketing company on a “per test” basis. Although the contracts were structured to be legal on their face, the documents provided by Shull indicate that the real arrangement between Shull and Claro was for Shull to be compensated not for services provided, as set forth in the contract, but based on the volume and value of referrals (that is, each test), which constitutes an unlawful kickback.

39.  Shull indicated his main point of contact for Tesis was Adam Shorr. Shull also dealt with Ronald King, the CEO of Claro. As noted, Shull provided records to the government pertaining to his business, SCG, his work with the call center, and his relationship with Tesis. Those records included numerous e-mails between Shull and Shorr at the SUBJECT ACCOUNT, as well as text messages between Shull, Shorr, and others, including Ronald King. Those communications evidence a kickback relationship between Shull and the Tesis labs.

40.  For example, on July 16, 2020, Shull e-mailed Shorr with the subject line “SCG / New Contract.” Although the existing contract was based on a flat rate for hourly marketing services, Shull e-mailed Shorr at the SUBJECT ACCOUNT that the “Total count should be 146 if this last fedex actually does get picked up. Can you please make sure we can get a wire out early tomorrow for the balance? Whether it’s 45 or 46.” Shull provided wire instructions to pay Sunrise Consulting Group, then stated, “Also, are we then going to initiate a new contract with SCG? Let me know because everything is set up already.” Shull and Shorr are discussing the number of swabs sent (via FedEx) from beneficiaries Shull recruited to Tesis—that is, the total number of swabs submitted. When asked about this text message in an interview, Shull stated these swabs were provided during a “ramp up” period in which Shorr/Claro was evaluating the volume of referrals Shull could send to Tesis in order to determine a compensation under a flat rate agreement.

14

41.     The next day, on July 17, 2020, Shull and Shorr continued the discussion of switching to a new contract via text message. These text messages discuss moving to the "PCP" (primary care physician) or doctor chase model. Shull stated that on a "new/revised/restructured contract whichever is allowed I was wanting to move to 50 per month for pcp." Your Affiant understands based on investigation that the "50 per month" refers to the number of swabs submitted, even though the contracts continue to discuss compensation for "business and marketing services." During this text exchange between Shull and Shorr, discussing payment, Shull texts, "If he's going off the contract then it's technically already broken bc of not following the safe harbor. So it would be better to just get the wire today for balance and then decide how to figure out PCP. And Claro reqs are already being faxed out so I just want to figure it out which I know we can." The "he" referred to is Ronald King. The "safe harbor" references the legal exception that allows for referrals from the marketing company to be paid for by the lab if on a flat fee basis pursuant to a personal services contract. The wire for the "balance" appears to refer back to the conversation from the day before, seeking compensation on a per-test basis.

42.     In another example of the kickback basis for the parties' agreement, on September 14, 2020, Shorr, using the SUBJECT ACCOUNT, sent Shull an e-mail with the subject line "sample." The e-mail attached a scanned document that was an Invoice from a marketing company, the name of which was crossed out with pen, and showing hours billed for "Advertising and Consulting," "Marketing Services," and "Customer Service." On September 18, 2020, Shull e-mailed Shorr an invoice in identical format as the "sample" sent to him on September 14. The hours listed for each task on the invoice were different than what was listed on the "sample," but the categories and format were the same. The invoice total was for $25,500. Shull asked Shorr in the text of the e-mail, "Let me know if this is sufficient." Although the invoice was structured in terms of hours billed for services, based on Your Affiant's investigation, the hours are not what mattered to the parties. The invoice was calculated to back into the amount owed on a per-test basis.

43.     In another example, on February 4, 2021, Shull texted Shorr requesting an update on wire transfer payment he was expecting. Shorr replied to Shull, "I don't think he's going to wire you because you were short the last month and then this month you weren't quite halfway there, which means there's a lot to make up. You can't go by the gross number submitted you have to go by the numbers that actually process. The numbers are very far off. If it was anywhere close I know he wouldn't say anything." Shull asks what he is supposed to do. Shorr says "Have to catch up at least in reasonable range." The reference to being "short" and not quite "halfway there" refers to the number of genetic swabs submitted and processed. When Shull states that "you can't go by the gross number submitted," he is referring to the total number of samples sent to the lab for testing. What counts, per the text message, is the number of swabs "processed," meaning swabs on which tests were run and insurance had paid for.  Approximately one month later, on March 5, 2021, Shull texted Shorr to ask if everything is good with the wires. Shorr replied, "He said you had 39 deals for the month. Not even half. Was hoping he would

pay you this time and not next time. He wanted to do the opposite." It is believed "he" referred to in these text messages is Ronald King.

44.   On or about June 30, 2021, Shull and Shorr texted regarding setting up a new contract. Shorr texted Shull: "Will send you a gram and by the close of business today. Remember we can make one change during the year, but think about if you want me to plug in the exact numbers we talked about yesterday." Shull responded, "We just have to figure out the math so all deals that are ahead get credited to new contract." Shorr responds, "Right." Shull replied, "I'll send some Excel sheets so we can figure it out. Wont be hard. Ahead on Claro by 65 for May/June combined minus however many aren't good and ahead on Alliance 45 for June minus whatever isn't good. So if we start new contract on Claro starting at say 60 and starting Alliance new contract at say 40 that's all I'm trying to accomplish so we know where the beginning are so it won't be zero." This conversation shows the parties discussing the number of swabs submitted monthly and whether, in essence, Shull met the quota set out as the basis for the flat fee contract. The fact that Shull had submitted more than required meant he was "ahead," and the parties were discussing how to credit Shull for those swabs, compensating therefore based on volume and value of tests, rather than a flat rate for any services provided.

45.   In addition to the foregoing, the records Shull provided included the following e-mails with Shorr at the SUBJECT ACCOUNT, which demonstrate that the account was used for the genetic testing business and in connection with the SUBJECT OFFENSES. The account included numerous e-mails with Tesis employees regarding specific patients, patient trackers that followed the number of samples submitted and approval status, and other matters. These e-mails include, for example:

A.   On April 16, 2020, Shorr e-mailed Shull from the SUBJECT ACCOUNT.  In the e-mail, Shorr requested Shull send him the "entire script."  During an interview of Shull, he confirmed that Shorr was asking for the sales script used by call center employees when they called beneficiaries.

B.   On May 26, 2020, Shull e-mailed Shorr at adam_shorr@yahoo.com.  The subject of the e-mail was "Workflow."  In the e-mail, Shull wrote the following regarding the process of collecting swabs from the beneficiaries:

   1. Point of Sale / Submit Webform
   2. QA Call w/in 1-3hrs
   3. Details of QA call - double check eligibility, confirm address, tell patient expect Fedex in 3-5days
   4. Upload to triage/scripting. Approx turnaround time 24-72hrs
   5. Dr's to return req form.  Approx turnaround time 24-72hrs
   6. Req forms into kits / shipping.  Approx time 12-24hrs
   7. Fedex to patients.  Overnight Fedex(24hrs)
   8. Kit chase team to contact delv Fedex kits (same day Fedex delv)
   9. Completed kits and Fedex back to Claro (Fedex return to Lab label 48hrs)

16

Adam hopefully this will help assist Tina & the team on the process for the completed kits coming back to Claro.

Call me with any questions or concerns.

Regards,

ts

C. On June 17, 2020, Paula Valverde, from the e-mail address of pvalverde@clarolaboratory.com, e-mailed Shorr at the SUBJECT ACCOUNT and Shull.  Valverde wrote, "Hello Tod, We received back a patient that is refusing to take this test.  Please review attachment.  Thanks."  The attachment to the e-mail was a handwritten note, which appears to be from a Medicare beneficiary.  The note read, "To Whom It May Concern:  Please know that I do not require or promote the request for a DNA test kit.  In addition, I do not know the person (David Posner DO) shown in the order provider section of the test requisition.  I therefore suspect that this is a Medicare fraud scam, and have reported this event to Federal."  Note: The rest of the note is cut off and unreadable.

D. On July 13, 2020, Shull e-mailed Shorr at the SUBJECT ACCOUNT.  The subject of the e-mail was "Completed Claro."  In his e-mail, Shull wrote, "The attached sheet contains the current up to date patients with completed kits back to the lab.  There are a few in route that land in CO today and not included on the sheet are a few people already with scheduled fedex picks ups.  So tomorrow this would go up by 2 assuming fedex picks up properly and hopefully more will be completed and picked up as well."

E. On September 30, 2020, Shull e-mailed Shorr at the SUBJECT ACCOUNT.  The subject line was "Revised to 150k."  In his e-mail, Shull wrote, "Adam: Please find the executed contract.  Send back countersigned when available."  Attached within the e-mail was a document signed by Shull titled "Marketing Business Services Agreement," dated September 29, 2020.  The agreement is between Sunrise Consulting Group, LLC as a "service provider" and Claro Scientific Laboratories, Inc. as the "company."  In Attachment B of the agreement, a "services rate company" agrees to pay the service provider $150,000.00 monthly in two separate payments of $75,000.00.

F. On October 15, 2020, Shull e-mailed Shorr at the SUBJECT ACCOUNT.  The subject of the e-mail was "SCG.Claro.Invoice.0002."  In the e-mail, Shull wrote, "Adam: Everything set for tomorrow based on these numbers?"  Attached within the e-mail was an invoice from Sunrise Consulting Group, LLC, attention "Ron King"

with the project title "Advertising Marketing." The invoice was for consulting and marketing services at an hourly rate of $250.00 and totaled $82,500.00.

46.    On September 15, 2021, your Affiant submitted a preservation letter pursuant to 18 U.S.C. § 2703(f) to Oath Holdings Inc., for the SUBJECT ACCOUNT (Reference #498596). On November 29, 2021, your Affiant renewed the preservation and requested a second preservation (Reference #505021).

47.    On September 24, 2021, the court signed an order for Oath Holdings Inc. to turn over non-content records for the SUBJECT ACCOUNT pursuant to 18 U.S.C. § 2703(d). Your Affiant served that order on Oath Holdings Inc. that same day, and Oath subsequently provided responsive non-content information. This information indicates Shorr used the SUBJECT ACCOUNT regularly to communicate with individuals involved in the genetic testing. For example:

- Records obtained through the court order showed Shull had e-mail communications with Tina Wellman at tinawellman@brightdrivehcs.com. Tina Wellman is listed as the CEO of Brightdrive HCS on their website Brightdrivehcs.com. Shull also communicated with Ronald King at rking@tesislaboratory.com and rking@brightdrivehcs.com. Shull indicated that BrightDrive HCS was a medical billing company that Ronald King was associated with, and Ronald King had an e-mail address with BrightDrive HCS. Shull explained that King was responsible for paying Sunrise Consulting Group. According to bank records from the Bank of Oklahoma, Tesis Labs, LLC officials stated, "BrightDrive Healthcare Solutions, LLC ('BrightDrive'), is a company currently managing the operations, billing and administration for a number of testing laboratories. Tesis Labs has entered into a contractual relationship with BrightDrive where it will manage, operate and administer its laboratories and provide billing services using BrightDrive's proprietary billing platform." The officials also wrote "Pursuant to the Administrative Services Agreement by BrightDrive and the Company, its CEO, Ron King, has become the CEO of Tesis Labs. Similarly, its Chief Operating Officer, Tina Wellman, as its COO, and their colleague, Victor Roiter, is its VP-Business Development." Bank records show regular payments from Tesis entities to these individuals. E-mails between Shull and BrightDrive individuals show that Tina Wellman was responsible for determining how to identify "diagnoses" associated with billing for tests. Records obtained through the Section 2703(d) order showed the SUBJECT ACCOUNT includes communications with the following e-mail addresses of individuals known to be associated with Tesis:
    rking@tesislaboratory.com  (March 30, 2020 through August 17, 2021)
    rking@brightdrivehcs.com  (August 19, 2019 through August 31, 2020)
    tinawellman@brightdrivehcs.com  (September 8, 2019 through December 9, 2020)
    twellman@tesislaboratory.com  (March 31, 2020 through December 9, 2020)

> vicr@rokocompany.com  (August 19, 2019 through June 26, 2021)
> victor.roiter@gmail.com  (August 29, 2019 through June 7, 2020)
> bradedson5@yahoo (January 23, 2019 through September 14,2021)

- Shull reported to law enforcement that, during his relationship with Tesis, he participated in a compliance training call with ten to twelve other marketing companies that also worked with Shorr for Tesis labs. Oath's response to the court order identifies e-mails from other individuals who appear to be associated with marketing companies. For example, the account includes e-mails with "jzocalli@gmail.com." Joseph Zocalli owns a company called Fast Flow Marketing, which has received payments from Claro totaling over $1.2 million based on records available through the end of August 2021. The account also includes e-mails from williegibbs72@gmail.com. Mississippi Secretary of State records identify Willie Gibbs as the CEO of Elderly Care Marketing Corp., which received payments from Claro totaling over $250,000 based on records available through the end of August 2021.

- Shull reported that there was an individual named Brian Thomas who he believed was a Registered Nurse. Shull reported that Brian helped Shorr create "kit chase" centers and that Shorr had referred Shull to Brian to work with him.  Shull corresponded with Brian Thomas at "brian@dlsmediagroup." This e-mail for Mr. Thomas also appears in the records for the SUBJECT ACCOUNT.

- Shull reported that Tesis used a telehealth provider to "sign off" on the genetic testing solicited through the call center, one of which was BEBD Medical, owned by Susan Braddock. E-mails with susbraddock@bebdmedical.com are present in the SUBJECT ACCOUNT.

48.  According to bank records from the Bank of Oklahoma, starting on March 27, 2020, and ending on August 5, 2021, Tesis/Claro entities paid Shull's company, SCG, $1,491,500.00.

49.  On July 7, 2021, Alliance DX LLC paid SCG $75,000.

50.  Bank records indicate that the Tesis entities were funded by various companies or entities that included investors. These entities transferred funds via a draw down on a line of credit or other mechanism to the Tesis entities. Bank records show repayments on these fund transfers.  Shorr's communications with Shull also reflect the investor participation. On April 28, 2020, Shorr sent a text message to Shull which stated, "Can you send that e-mail to me so I can forward to Ron, about the 10, 20 and 30 day forecast.  He has a board and investors to answer to, which is why everything has to be so structure. Ty".

51.  Shull stated his relationship with Tesis was through Adam Shorr, and they began talking about working together before the Tesis entities officially began operating in early 2020.

Further, information provided by Oath in response to the Section 2703(d) order reveals that Shorr corresponded with Brad Edson, one of the responsible Claro officials on the bank records, in January 2019, via the same e-mail M r. Edson used to correspond with a bank regarding Claro accounts (bradedson5@yahoo.com).

## **EVIDENCE**

52.    Your affiant knows from training and experience that persons engaged in healthcare fraud often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify individuals involved in criminal activity and reveal fraud schemes. Your Affiant knows from training and experience that the complete contents of e-mail accounts may be important to establishing the actual user who has dominion and control of an e-mail account at a given time. E-mail accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Therefore, the content of a given account, including the e-mail accounts that send messages to a given account often provides important evidence regarding the actual user's dominion and control of an e-mail account.

53.    Your Affiant knows from training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of e-mail conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an e-mail or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis ":)" to convey a smile or agreement) to discuss matters. Keyword searches would not account for any of these possibilities, so actual review of the contents of an e-mail account by law enforcement familiar with the identified criminal activity is necessary to find all relevant evidence within the account.

54.    Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review records produced by a Service Provider and keep only such records as the Government finds to be related to the offenses described herein and in Attachment B during a single analysis. Your Affiant has learned through practical experience that various e-mails often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.

Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between e-mail threads, and any respective attachments, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.

55.    In the past, your Affiant has reviewed activity within e-mail accounts pursuant to search warrants in the course of ongoing criminal investigations. Affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the activity in the account at different times is necessary to understand the full value of the information contained therein. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the e-mails and data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data provided by the Service Providers, and to review the communications in the control and custody of the government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the government will obtain the mirrored images in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

56.    This application seeks a warrant to search all responsive records and information under the control of Oath Holdings Inc. a provider subject to the jurisdiction of this court, regardless of where the company has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Yahoo's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.[4]

57.    Your Affiant is seeking permission to seize information pertaining to the SUBJECT OFFENSES pertaining to genetic testing, such offenses occurring in or after January

---

[4] It is possible that Oath Holdings Inc. stores some portion of the information sought outside of the United States. In *Microsoft Corp. v. United States*, 2016 WL 3770056 (2nd Cir. 2016), the Second Circuit held that the government cannot enforce a warrant under the Stored Communications Act to require a provider to disclose records in its custody and control that are stored outside the United States. As the Second Circuit decision is not binding on this Court, I respectfully request that this warrant apply to all responsive information— including data stored outside the United States—pertaining to the identified account that is in the possession, custody, or control of Oath Holdings Inc. The government also seeks the disclosure of the physical location or locations where the information is stored.

2020 and continuing through the date the data is collected by the Provider. This may include information created prior to the commencement of the criminal activity. As noted herein and as requested in Attachment B, relevant evidence includes information regarding identification of the user and the participants in the SUBJECT OFFENSES, the relationships between the participants, the knowledge and background of the participants in the SUBJECT OFFENSES, state of mind of the coconspirators, motive, and communications and information related to the initiation and planning of the scheme. The relevance of such information and its status as evidence of the SUBJECT OFFENSES is not time-limited to the period in which the criminal offenses were completed.

## REQUEST FOR NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE

58.    Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), your Affiant requests the Court order Provider not to notify any other person of the existence of this warrant. This request is made because notification of the existence of the warrant will result in destruction of or tampering with evidence.

59.    Because the investigation is ongoing, I would further request the Court to order Provider to continue to maintain the account further detailed in Attachment A, in an open and active status.

## EXECUTION PROCEDURE

60.    If, during its review of the information produced by the Provider pursuant to the procedures outlined in Attachment B, the government identifies communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

**CONCLUSION**

61.    Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence and instrumentalities of the SUBJECT OFFENSES may be located within the e-mail account described in Attachment A.

62.    I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

63.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Oath Holdings Inc. Because the warrant will be served on Oath Holdings Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_\_\_/s/ Cory Rumple_____
Special Agent Cory Rumple
U.S. Department of Health and Human Services
Office of Inspector General

Subscribed and sworn to before me on _____January 10, 2022_____, 2022

HON. KRISTEN L. MIX
UNITED STATES MAGISTRATE JUDGE

**This affidavit was reviewed and is submitted by AUSA Anna Edgar.**

23